**BURGER KING CORPORATION,**
Plaintiff,

v.

**ASHLAND EQUITIES, INC., Reinold T. Belle, and Robert E. Clarke,**
Defendants.

No. 00–1804–CIV.

United States District Court, S.D. Florida.

June 26, 2002.

Jonathan Perlman, Jessica Serell Erenbaum, Michael D. Joblove, Dennis Dean Leone, Nina Greene Kersh, Genovese Joblove & Battista, Miami, FL, for Plaintiff.

Robert Zarco, Robert Mitchell Einhorn, Jude Christopher Cooper, Zarco Einhorn & Salkowski, Miami, FL, for Defendants.

### ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

GOLD, District Judge.

THIS CAUSE is before the Court upon Plaintiff Burger King Corporation's ("BKC") Motion for Summary Judgment [D.E. 76], filed on December 28, 2001. Defendants Ashland Equities, Inc. ("Ashland"). Reinold T. Belle ("Belle"), and Robert E. Clarke ("Clarke") filed a Response to Plaintiff's Motion for Summary Judgment on January 22, 2002 [D.E. 102] and Plaintiff BKC replied [D.E. 122] on February 15, 2002. Oral argument on Plaintiff's Motion for Summary Judgment was held on April 12, 2002.

The Complaint, filed on May 24, 2000, alleges three counts: Breach of Contract against Defendant Ashland (Count I); Breach of Contract against Defendants Belle and Clarke (Count II), and Breach of Guaranty against Belle and Clarke (Count III). In response, the Defendants assert

the following claims against BKC in their Answer and First Amended Counterclaim [D.E. 23]: Breach of Contract (Count I). Breach of Implied Covenant of Good Faith and Fair Dealing (Count II), and Tortious Interference with Contractual Relations (Count III).[1] Jurisdiction is invoked pursuant to 28 U.S.C. § 1332(a)(1) as the case at bar involves diverse parties and a matter in controversy exceeding the sum or value of $75.000.00, exclusive of costs and interest. Upon a review of the parties' arguments, relevant case law, and record, the Court concludes that Plaintiff's Motion for Summary Judgment on the Complaint and Defendants' Counterclaim should be granted.

## I. FACTUAL BACKGROUND[2]

Plaintiff BKC is a Florida corporation with its principal place of business in Miami, Florida. Defendant Ashland is a Kentucky corporation and Defendants Belle and Clarke are both citizens of the state of Kentucky. It is undisputed that the Defendants were the franchisees of five Burger King restaurants located in Kentucky and Ohio. *See* Statement of Undisputed Facts ("SUF"), ¶ 1; Defendants' Statement of Disputed Facts ("SDF"), p. 1. These restaurants were governed by Franchise Agreements, each with a twenty (20) year term period.[3] *Id.* The Franchise Agreements for the restaurants were executed on various dates and were, accordingly, scheduled to expire on different dates.[4] *Id.* The Defendants also executed Lease/Sublease Agreements in which they leased premises for restaurants # 2726 and # 2980 from Plaintiff BKC. *See* SUF, ¶ 2; Decl. of Frank Taylor, ¶ 6. On November 4, 1996, Defendants Clarke and Belle assigned their Franchise Agreement for BKC restaurant No. 4230 to Defendant Ashland. SUF, ¶ 3; SDF, pp. 1–2. Pursuant to the Assignment and Assumption of Restaurant Franchise Agreement and Consent to Assignment, Defendants

1. Defendants' First Amended Counterclaim also asserted a violation of the Florida Deceptive Trade Practices Act (Count IV). However, this Count was dismissed with prejudice by Court Order which granted Plaintiff's Motion to Dismiss Counterclaim in part [D.E. 41].

2. In support of its Motion for Summary Judgment, Plaintiff BKC has filed an Appendix [D.E. 77] including, *inter alia*, the following exhibits: Burger King Franchise Agreement; Burger King Lease/Sublease, Burger King Assignment Agreement. May 11, 2000 letter rejecting buyer, and Letter confirming termination of Franchise Agreements. BKC has also submitted various declarations including the declarations of Rosario Galvez–Barreiro, Gregory Hicks, Frank W. Taylor, and Craig Prushner. Moreover, the Plaintiff has filed a Concise Statement of Undisputed Material Facts pursuant to Local Rule 7.5 of the Local Rules for the United States District Court of the Southern District of Florida. In response, the Defendants have provided two appendices [D.E. 104 & 105] in opposition to Plaintiff's Motion for Summary Judgment including, *in-*

*ter alia*, the following exhibits: Declarations of Belle, Marvin Virgin, and Rodney Robinette as well as the Depositions of Richard W. Martin and John F. Vincent. Defendants have also included a Concise Statement of Disputed Facts pursuant to Local Rule 7.5. Any dispute between the parties is noted in the Factual Background section above.

3. As the Franchise Agreements are the same, an example has been filed with the Court. The Court references to the example labeled as Exh. A to Plaintiff's Appendix to the Motion for Summary Judgment.

4. BKC Restaurant No. 2726 was executed on January 28, 1980, as amended, and expired on January 28, 2000; BKC Restaurant No. 2989 was executed on August 31, 1980, and expired on August 21, 2000; BKC Restaurant No. 4230 was executed on August 8, 1984, and was scheduled to expire on August 8, 2004; BKC Restaurant No. 6655 was executed on January 27, 1990, and was scheduled to expire on January 21, 2010; and BKC Restaurant No. 9824, executed on June 24, 1996, was scheduled to expire on June 24, 2016.

Clarke and Belle remained "personally liable for, unconditionally obligated to and bound by each and every term, obligation and restriction applicable to the franchisee under the Franchise Agreement, and the ASSIGNEE [Ashland] under any other agreements hereafter entered into by BKC and ASSIGNEE, whether for monies or duties, and for any other obligation of ASSIGNOR to BKC." Assignment Agreement, Plaintiff Appendix, Exh. C, ¶ 2.

According to the express terms of the Franchise Agreements, the Defendants were required "to pay to BKC a royalty of 3.5% of gross sales for use of the Burger King System and the Burger King Marks" on a monthly basis. See Franchise Agreement, ¶ 8A, Plaintiff Appendix, Exh. A. The Defendants also agreed to "pay to BKC an amount equal to 4% of FRANCHISEE's monthly gross sales ... for advertising, sales promotion and public relations both in the market area ... and on a national basis." See Franchise Agreement, ¶ 8B, Plaintiff Appendix, Exh A. Under the terms of the Franchise Agreements, the failure to pay any royalty or advertising and sales promotions constituted an act of default. See Decl. of Frank Taylor, ¶ 5; Franchise Agreement, ¶ 16A(2), Plaintiff Appendix, Exh. A.

Additionally, the Sublease/Lease Agreements for Burger King Restaurants Nos. 2726 and 2989 further required Defendants Belle and Clarke to pay rent, percentage rent, and to reimburse BKC for property taxes paid. See Decl. of Frank Taylor, ¶ 6; Lease, Plaintiff Appendix, Exh. B. Failure to pay monthly rent also would be considered a breach of the leases. Id. It is not disputed by the parties that the Defendants failed to make the required royalty payments due since November 1999, all advertising payments due, as well as property taxes due in September 2000. See Taylor Decl., ¶ 9; SDF, p. 2. Defendants admit that Plaintiff BKC provided notice to the Defendants of the defaults under the Franchise and Lease Agreements. SDF, p. 2; May 15, 2000 Notice of Default, Pl. Appendix, Exh. D.

Upon expiration of various Franchise Agreements and receipt of the notice of default, the Defendants requested several extensions to the Franchise Agreements in order to locate a purchaser for the franchises and pay outstanding fees and royalties owed to BKC. See SUF, ¶ 7; SDF, p. 2. Although not required to do so under the terms of the Franchise Agreements, Plaintiff BKC granted the Defendants several extensions. See Agreements to Extend Restaurant Franchise Agreement, Plaintiff Appendix, Exh. E; Extensions to Notice of Default, Reply, Exh. D (Composite exhibit showing eleven extension of termination provided to Defendants by BKC within a four (4) month period). Plaintiff BKC offered to renew the franchise agreements upon selection and approval of a new buyer/purchaser. See SUF, ¶ 7; SDF, p. 2.

The Franchise Agreements provide detailed guidelines and provisions regarding Defendants' ability to sell franchised restaurants, namely the following:

**14. ASSIGNMENT: CONDITIONS AND LIMITATIONS**

A. This Agreement and license are personal to FRANCHISEE and FRANCHISEE shall not sell, assign or transfer this Agreement or any right or interest in the license granted, nor permit any such assignment or transfer to occur directly, indirectly or contingently by agreement or operation of law without the prior written consent of BKC.... The assignment of any interest, except as provided in paragraphs 14 and 15, shall constitute a material breach of this Agreement. Franchise Agreement, ¶ 14.A.

\*       \*       \*       \*       \*       \*

## 15. RIGHT OF FIRST REFUSAL

A. In the event FRANCHISEE receives an acceptable bona fide offer from a third party to purchase the Franchised Restaurant, he shall give BKC written notice setting forth the name and address of the prospective purchaser, the price and terms of the offer together with a franchisee application completed by the prospective purchaser, a copy of the sales contract and such other information that BKC may request in order to evaluate the offer. BKC shall then have the prior option to purchase FRANCHISEE's interest covered by such offer at the price and upon the terms of such offer.

\*   \*   \*   \*   \*   \*

D. If BKC does not accept the offer to purchase the Franchised Restaurant, FRANCHISEE may conclude the sale to the purchaser who made the offer provided BKC's consent to the assignment be first obtained, which consent will not be unreasonably withheld upon compliance with the conditions imposed by BKC on assignment. Conditions on assignment may include without limitation:

(1) All obligations of FRANCHISEE to BKC, whether arising under this Agreement or otherwise, must be satisfied at the time of transfer.

(2) Prospective purchaser must complete and be approved through BKC's standard franchisee selection process including satisfactorily demonstrating to BKC that he meets the financial, character, managerial, equity ownership and such other criteria and conditions as BKC shall then be applying in considering applications for new licenses.

(3) Prospective purchaser shall have satisfactorily completed BKC's training for new franchisees. *See* Franchise Agreement, ¶ 15.A., 15D.1–3.

The Defendants located Regional Investments, Inc. ("Regional") as a potential purchaser of the five (5) franchise Restaurants at issue. *See* Belle Decl., ¶¶ 9–11; Marvin Virgin Decl, ¶¶ 9–11. Regional is an investment group created by Mr. Marvin Virgin and Ms. Melissa Virgin for the purpose of purchasing the BKC restaurants from the Defendants. *See* Belle Decl., ¶ 9; Marvin Virgin Decl, ¶ 9. The Defendants and Regional entered into a Purchase Agreement for the sale of the Restaurants in January of 2000. *See* Belle Decl., ¶ 10; Marvin Virgin Decl, ¶ 10. Soon thereafter, in February of 2000, Regional submitted an application to BKC, as required by the Franchise Agreements, to be approved as the franchisee of the five restaurants. *See* Belle Decl., ¶ 11; Marvin Virgin Decl. ¶ 11. Defendants assert that Regional maintained an appropriate level of experience and capital to satisfy BKC's standards and conditions for approval of a sale to a third-party.

However, upon a review of Regional's application, Plaintiff BKC rejected Regional as a potential buyer of the Franchised restaurants. BKC notified Regional of its denial of the sale in a letter dated May 3, 2000, a copy of which was sent to the seller, Defendant Belle. *See* May 3, 2000 letter from Debra C. Arone to Marvin Virgin, Def. Appendix, Exh. G. The letter informed Regional that based upon BKC's review of the documents submitted in connection with its application, BKC determined that Regional did "not satisfy BKC's standards for franchise approval." *Id.* Pursuant to the record, Burger King initially rejected Regional's application for various reasons, including lack of operational experience and failure to meet BKC's internal guidelines. In particular, on May 2, 2000, prior to sending the May 3, 2000 letter, Debra Arone received an e-mail from Gregory Hicks, the director of franchise operations, recommending that

BKC deny the Regional application "based on insufficient operational experience." *See* May 2, 2002 e-mail, Plaintiff Appendix, Exh. F; Hicks Depo., p. 37. Hicks concluded that Regional lacked "fast food restaurant experience" which he believed to be essential where the five (5) franchised restaurants at issue required "major financial re-investment and an experienced operator with a successful track record ... to transform the restaurants and make them competitive again." Hicks Decl., ¶ 6. Hicks further found that, pursuant to a review of the resumes of Marvin and Melissa Virgin, the Virgins lacked such fast food restaurant experience. *Id.* at ¶ 7. Mr. Virgin has no experience in operating fast food restaurants and Ms. Virgin likewise lacked operational knowledge in the fast food industry as her prior work experience simply included a position as a secretary/bookkeeper for Ashland. *Id.*

Furthermore, Michael Alonso, a Franchising Manager for BKC, whose duties included an initial review of new franchisees, concluded from his review of the Regional application and capitalization plan, that the Regional plan should not be approved because it proposed a "highly leveraged purchase" which depended upon exaggerated sales projections and failed to include sufficient capital expenditures. *See* Michael Alonso Decl., ¶ 5. In particular, Alonso explained that the plan should not be approved because (1) Regional proposed to borrow the full purchase price where BKC typically required at least thirty percent (30%) of the purchase price be paid with equity; (2) Regional proposed an unrealistic sales growth of 17% in the first year and 12% and 7% for each year thereafter; and (3) Regional's projections failed to account for required expenditures for capital improvements. *See* Alonso

Decl., ¶¶ 6–8. Financial Consultant Rosario Galvez–Barreiro, a certified public accountant, made similar conclusions upon her complete financial evaluation of Regional's capitalization plan in May 2000.[5] *See* Galvez–Barreiro Decl., ¶¶ 4–8. Indeed, although Galvez–Barreiro utilized another, arguable more realistic, sales growth projection. BKC still concluded that the Regional plan failed to meet ratios typically used by BKC. *Id.* at ¶ 13.

After a request from the Defendants for further information regarding the denial, BKC sent a letter to Defendant Belle, a copy of which was sent to Regional, on May 11, 2000, stating once again that Regional's application was disapproved. *See* Letter from Debra Arone to Reinold Belle, Pl. Appendix, Exh. G. The letter explained: "Based on our review of the documents ..., we have determined that certain items, including, but not limited to, sales estimates and the amount of capital reinvestment as described in the cap plan do not reflect what we believe will be the future performance of the restaurants. The transaction, as presently structured, would create a business which, we believe, does not have acceptable prospects of long-term success in the Burger King System." *Id.* Although Regional's application was denied, BKC, Regional, and the Defendants continued to discuss possible changes in Regional's proposed management structure and financial plan, which could have ultimately resulted in approval of the sale. *See* Hicks Decl., ¶ 8. However, Regional never submitted a revised proposal for review. Accordingly, BKC did not formally reconsider its rejection of the proposed sale. *Id.*

Defendants claim that Plaintiff's denial of Regional's application was made in bad

---

5. Evidence in the record confirms that Alonso received information regarding the Regional proposal and did an analysis of the proposal prior to receipt of the files by Ms. Galvez–Barreiro. *See* Galvez–Barreiro Depo., p. 49.

faith and with malice and ill will. According to the Defendants, BKC's disapproval of the sale was made in bad faith because the Plaintiff did not undertake a financial analysis of Regional's application until *after* its decision to reject the sale. *See* SDF., p. 3. In particular, at the time the denial letters were sent to Regional and the Defendants in early May, BKC had not yet requested a financial analysis from Ms. Barreiro. *See* May 17, 2000 Memorandum by Debra Arone to Ms. Galvez–Barreiro, Def. Appendix, Exh. J. Rather, Defendants contend, the Plaintiff undertook a financial analysis after the fact for the sole purpose of justifying its wrongful decision to deny Regional's plan. *See* SDF, p. 4. BKC also had not met with any of the proposed purchasers at the time the application was denied. *See Id.* at 3. Moreover, the Defendants assert that BKC manipulated and used misleading data in order to reject the Regional proposal on financial grounds. *See* SDF, p. 6. Finally, Defendants dispute Plaintiff's conclusion that Regional lacked the requisite operational experience because, they argue, Rhonda Riley possessed an adequate level of experience to successfully operate the BKC restaurants. *Id.* at 7; Belle Decl., ¶¶ 24–25; Marvin Virgin Decl., ¶¶ 22–23.

Due to Plaintiff's disapproval of the sale, Defendants assert that they were unable to cure their financial defaults under the Franchise Agreements and Leases. As a result, BKC sent a letter on October 16, 2000 confirming that the five Franchise Agreements were terminated effective October 13, 2000 as stated in the initial May 15, 2000 Notice of Default, which had been subsequently extended several months by the Plaintiff at the Defendants' request. *See* October 16, 2000 letter, Plaintiff Appendix. Exh. H. The termination of the Franchise Agreements ended Defendants "right to use BKC Marks and the Burger King system" at the restaurants. *Id.*

Plaintiff BKC has moved for Summary Judgment on its Breach of Contract claims as well as Defendants' Counterclaim, requesting the amount of $329,440.30 for past due royalties, rent, property taxes, advertising contributions, and CAM.[6] Defendants do not dispute that they owe royalties and other fees under the Franchise Agreements. Nevertheless, Defendants oppose the Motion for Summary Judgment arguing that BKC is not entitled to recover past due royalties and fees because the Plaintiff breached the Franchise Agreements by unreasonably disapproving Regional's plan and by acting with malice and/or in bad faith in refusing to consent to the purchase of the BKC restaurants. Accordingly, Defendants request that Plaintiff be estopped from asserting any right of recovery as a result of Defendants' breaches of the Franchise Agreements and that summary judgment be denied. Upon review of the parties' arguments, relevant case law, and record, the Court concludes that the Plaintiffs' Motion for Summary Judgment on the Complaint and Defendant's Counterclaim should be granted.

## II. LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment

---

**6.** Plaintiff BKC originally also requested future lost profits in the amount of $502,876.00. However, after oral argument was heard on Plaintiff's Motion for Summary Judgment, and pursuant to Court order requesting additional briefing on the matter of lost profits, Plaintiff informed the Court in writing on April 26, 2002 that they withdraw their claim for future damages, "specifically those damages resulting from Defendants' breach of agreement from the time of the restaurants' closure through the remaining terms of the Franchise Agreements." Notice of Withdrawal of Claim for Future Damages. Plaintiff BKC, however, continues to seek all past due damages under the Franchise Agreements and Leases. *Id.*

where the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party has the initial burden of informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue as to any material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Celotex v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

In response to a properly supported motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Issues of fact are genuine only if a reasonable fact-finder, considering the evidence presented, could find for the nonmoving party. *Anderson*, 477 U.S. at 247–51, 106 S.Ct. at 2510–11. If the non-moving party fails to · "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," then the court must enter summary judgment for the moving party. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552.

In determining whether to grant summary judgment, the district court must remember that, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. The court resolves all ambiguities and draws all justifiable inferences

in favor of the non-moving party. *Id.* Furthermore, summary judgment is properly regarded not as a disfavored procedural shortcut but, rather, as an integral part of the federal rules as a whole, which are designed to secure a just, speedy, and inexpensive determination of every action. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

## III. DISCUSSION

### A. *Breach of Contract*

#### 1. Plaintiff's Complaint

Plaintiff BKC argues that it is entitled to summary judgment on its breach of contract claims because the Defendants are in default of the express terms of the Franchise Agreements. In particular, as discussed above, the Franchise Agreements provide that the Defendants must pay a royalty of 3.5% of gross sales on a monthly basis as well as 4% of gross sales for advertising, sales promotions, and public relations. *See* Franchise Agreement, Plaintiff Appendix, Exh. A., ¶ 8. Importantly, the Franchise Agreement states that failure to pay these royalties "shall constitute an act of default" under the Agreement.[7] *Id.* at ¶ 16; *See* Taylor Decl., ¶ 5.

It is well-settled that when the terms of a contract are clear and unambiguous, the contracting parties are bound to those terms and may not rewrite the contract to make it more advantageous or reasonable for one of the contracting parties. *See Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1290–91 (11th Cir.2001) (quoting *Emergency Assocs. of Tampa, P.A. v. Sassano*, 664 So.2d 1000,

7. Pursuant to the terms of the Franchise Agreement, the contract between the parties, "shall be governed and construed under and in accordance with the laws of the State of Florida." *See* Franchise Agreement, ¶ 18C.(1). Accordingly, this Court analyzes the Breach of Contract claim under Florida law.

1003 (Fla.App. 2 Dist.1995)). It is uncontested by the parties that the terms of Franchise Agreements are unambiguous. Further, the parties do not dispute that the Defendants have failed to pay royalties since November 1999 and advertising payments and property taxes due in September 2000 even though they received a Notice of Default. *See* Taylor Decl., ¶ 9. Indeed, the Defendants have not produced any evidence disputing that they failed to pay royalties and other costs required under the Franchise Agreements.[8] Accordingly, the Court finds that the Defendants have breached the Franchise Agreements by their failure to pay requisite royalties and fees required pursuant to the express terms of the Franchise Agreements and Plaintiff BKC is entitled to summary judgment on its claims for Breach of Contract. *See Burger King Corp. v. Majeed*, 805 F.Supp. 994, 999, 1003 (S.D.Fla.1992) (franchisee's failure to pay contractual obligations constitutes a clear act of default under the terms of the franchise and lease agreements); *In re Gainesville P–H Properties, Inc.*, 77 B.R. 285, 293–94 (Bkrtcy.M.D.Fla.1987) (holding that any "material breach of a franchise agreement which infringes on the franchisor's rights is grounds for terminating the relationship").

### 2. Defendants' Counterclaim

■ While it is clear the Defendants have breached the Franchise Agreements, Defendants argue that the Plaintiff has also breached the express terms of the Franchise Agreements by unreasonably refusing to consent to the sale of BKC restaurants which would have provided monies for the payment of royalties and other payments past due. In short, Defendants assert that the Plaintiff acted maliciously or in bad faith should be estopped from recovering past due amounts regarding *inter alia* royalties and advertising.

Plaintiff BKC, on the other hand, responds that the express terms of the Franchise Agreement provide that the Plaintiff may consent to a purchaser pursuant to its own judgment and application of BKC's own standards. According to BKC, the Regional proposal was considered pursuant to the BKC standards set forth in the Agreement and simply failed to meet BKC's requirements for approval of a sale. Plaintiff asserts that this decision was reasonable and not made in bad faith. As a result, BKC should not be held in breach of the Franchise Agreements and is entitled to summary judgment on Defendants' Counterclaim for Breach of Contract.

As discussed above, Sections 14 and 15 of the Franchise Agreements govern Defendants' ability to sell the franchised restaurants. Section 14 contains the conditions and limitations for the sale, assignment or transfer of the Franchise Agreement by the franchisee. This section expressly provides that the franchisee shall not sell his agreement or any right in his license "without the prior written consent of BKC." Franchise Agreement, ¶ 14.A. Further, Section 15 contains provisions governing BKC's Right of First Refusal. This Section provides that a franchisee must give written notice to BKC of any bona fide offer from a third party regarding the purchase of a Franchised Restaurant. *See* Franchise Agreement, ¶ 15.A. The written notice to BKC must include *inter alia* the price and terms of the offer as well as an application completed by the prospective purchaser and any "such other information that BKC may request in order to

---

**8.** While the Defendants, in relevant part, argue that Plaintiff BKC should not recover for Defendants' breach due to the Plaintiff's alleged malicious or bad faith actions, such an argument is without merit on the present record as discussed in detail below.

evaluate the offer." *Id.* BKC has the option to purchase the franchisee's interest covered by the offer at the same price and terms presented in the offer. *Id.*

In this case, a third-party, Regional, presented an offer to purchase five restaurants from the Defendants. As required, Regional submitted an application and relevant information to BKC. It is undisputed that BKC decided not to exercise its right of first refusal to purchase the restaurants from the Defendants. Where BKC does not accept an offer to purchase a Franchised Restaurant, Section 15D provides that the Franchisees (Defendants) "may conclude the sale to the purchaser who made the offer *provided that BKC's consent to the assignment be first obtained, which consent will not be unreasonably withheld upon compliance with the conditions imposed by BKC on the assignment.*" Franchise Agreement, ¶ 15.D (emphasis added). Conditions imposed by BKC may include: (1) that the franchisee must satisfy all obligations under the Franchise Agreement at time of transfer; (2) the prospective purchaser has satisfactorily completed BKC's training for new franchisees; and (3) the prospective purchaser "must complete and be approved through BKC's standard franchisee selection process including satisfactorily demonstrating to BKC that he meets the financial, character, managerial, equity ownership and such other criteria and conditions as BKC shall then be applying in considering applications for new licenses." Franchise Agreement, ¶ 15. D.1–3.

Pursuant to the above discussion, it is clear that once BKC has decided not to purchase a Franchised Restaurant, it cannot unreasonably withhold consent of a sale to a prospective purchaser. The Franchise Agreement is equally clear, however, that the determination of whether a prospective purchaser has satisfied the standard selection process for new

franchisees is within BKC's discretion. First, Section 14 of the Franchise Agreement provides that all transfers, sales, or assignments are conditioned upon BKC's prior written consent. Further, where a third-party seeks to purchase a Franchise restaurant, as in this case, pursuant to Section 15D, a prospective purchaser must demonstrate *to BKC* that he meets the "financial, character, managerial ... and such other criteria and conditions" as BKC shall apply in considering such applications. Franchise Agreement, ¶ 15.D.3. Section 15 continues to provide that it is only "upon compliance with the conditions *imposed by BKC,*" that consent to a sale will not be unreasonably withheld. Accordingly, once a prospective purchaser has complied with the conditions imposed by BKC. BKC may not "unreasonably withhold" consent. Likewise, the converse is true, if a prospective purchaser has not satisfied BKC's conditions and standards, BKC may "reasonably" withhold consent and disapprove a sale.

The Court finds that BKC did not unreasonably withhold consent to the Regional sale, as argued by the Defendants, because Regional failed to demonstrate to BKC that it satisfied all relevant criteria applied by BKC in evaluating new franchisee applicants. Several cases within this Circuit demonstrate that BKC maintains complete discretion under the Franchise Agreement to determine whether Regional, indeed, satisfied all of BKC's requirements despite the inclusion of a reasonableness clause included in Section 15D. For example, in *Burger King Corp. v. H & H Restaurants, LLC.,* No. 99–2885, 2001 WL 1850888 (S.D.Fla. Nov. 30, 2001), the Court interpreted similar language in a *Burger King* Franchise Agreement. The franchisee in *H & H,* likewise, was required to obtain the written consent of BKC prior to the sale or assignment of a franchised restaurant. As in this case,

consent to such a sale also could not be "unreasonably withheld upon compliance with the conditions imposed by BKC." *See* *H & H*, 2001 WL 1850888 at * 3. In addition, the Franchise Agreement in *H & H* provided that whether or not a transferee satisfied BKC's standards and requirements was within "BKC's sole judgment." *Id.*

Similar to the Defendants at bar, the Defendant in *H & H* argued that BKC violated the Franchise Agreement because Burger King unreasonably withheld consent of a sale when it denied sale of a Franchised restaurant to a prospective buyer even though, according to franchisee, the buyer was current on all obligations, was an existing Burger King operator, and maintained the personnel and infrastructure to operate BKC restaurants at peak efficiency. *Id.* The Court, however, rejected Defendant's argument holding that BKC did not breach the Franchise Agreement in violation of Florida law because its decision to disapprove the sale was within its "sole judgment."[9] *Id.* 2001 WL 1850888 at *5.

While the Agreements at issue in this matter do not expressly state that the satisfaction of all requirements are within BKC's "sole judgment," it is clear from the language of Sections 14 and 15 that BKC does maintain complete discretion to determine whether a prospective purchase, Regional, meets the required financial, managerial, and other required conditions applied by BKC. Regional is required to demonstrate such criteria to BKC and must be approved through "BKC's standard· franchise selection process." Moreover, no sale may be complete unless prior written consent is given by BKC. Where BKC has retained complete discretion in a Franchise Agreement to determine whether a prospective purchaser meets its qualifications for new franchisees, the contract bars Defendants' breach of contract claim. *See e.g. Burger King Corp. v. Hinton, Inc.,* 203 F.Supp.2d 1357, 1362 (S.D.Fla.2002) (holding provision that states BKC must provide·support for marketing and advertising that BKC "deems necessary to continue to communicate and advice FRANCHISEE as to the Burger King System" as being within BKC's sole reasonable discretion, thus, barring Defendants' breach of contract claim); *Ernie Haire Ford, Inc. v. Ford Motor Co.,* 260 F.3d 1285, 1290 (11th Cir.2001) (affirming summary judgment denying dealer's breach of contract claim where dealership agreement required manufacturer's written consent for relocation of dealership based on manufacturer's "best judgment"); *Perez v. McDonald's Corp.,* 60 F.Supp.2d 1030, 1035 (E.D.Cal.1998) (holding franchisor did not arbitrarily withhold its consent to transfer franchisee's interest in restaurant where prospective purchasers did not complete required training as set forth in the Franchise Agreement and where franchisor's written consent was required for sale).

In this case, the Court finds that BKC did not unreasonably withhold consent because Regional failed to satisfactorily demonstrate to BKC that it meets all the financial, managerial, and other criteria BKC..generally applies when evaluating new franchisee applications. First, BKC concluded that the Regional plan should not be approved because Regional did not have sufficient "operational experience." Specifically, the application proposed that the restaurants would be run by Marvin and Melissa Virgin. However, both lacked

---

**9.** In its Response, Defendants simply states that it believes *H & H* ignores the "unreasonably withheld" clause and misapprehended Florida law. While the Defendants note that a Motion for Reconsideration was pending in *H & H,* the Motion for Reconsideration was recently denied. This Court finds the decision persuasive in the present case.

fast food restaurant experience required by BKC. *See* Hicks Decl., ¶¶ 6–7.

Defendants argue that Plaintiff BKC acted in bad faith in rejecting its application on this ground because the denial occurred prior to any discussions with Regional or the Defendants. Moreover, Defendants assert that Rhonda Riley had the requisite level of experience to successfully operate the BKC restaurants. As a result, Defendants contend BKC could not have reasonably rejected Regional's application for operational or managerial reasons. The Court, however finds Defendants' arguments unavailing. Defendants do not point to any contractual language, nor has the Court found such language, requiring BKC to meet with or discuss requirements with all prospective purchasers prior to disapproval of a sale. Further, the record does not show that BKC accepted Rhonda Riley as a manager of the Franchised Restaurants. Rather, the record indicates that, pursuant to telephone discussions conducted *after* BKC rejected Regional's application, BKC informed the Defendants and Regional that the operational requirements could be met if (1) Marvin Virgin committed to running the day-to-day operations of the five restaurants and attended training for five months; (2) Rhonda Riley would serve as management director and operator of the restaurants; and (3) Regional provided details regarding hiring, training, measurable goals, speed of service, and customer focus areas. *See* Hicks Depo., pp. 49– 53. While these changes were discussed, Regional never resubmitted a plan or application indicating a firm commitment to make the aforementioned changes. *See* Hicks Depo., pp. 55–56. Accordingly, Defendants failed to satisfy BKC's managerial requirements and Plaintiff BKC is entitled to summary judgment on this basis alone.

Further, BKC denied Regional's application for various financial reasons as well.

According to BKC's review of the application, Regional proposed a "highly leveraged purchase" which depended upon exaggerated sales projections and failed to include sufficient capital expenditures. *See* Michael Alonso Decl., ¶ 5. In particular, BKC concluded within its discretion that Regional's application was inadequate because (1) Regional proposed to borrow the full purchase price where BKC typically required at least thirty percent (30%) of the purchase price be paid with equity; (2) Regional proposed an unrealistic sales growth of 17% in the first year and 12% and 7% for each year thereafter; and (3) Regional's projections failed to account for required expenditures for capital improvements. *See* Alonso Decl., ¶¶ 6–8.

Defendants contend that BKC unreasonably and with malice rejected Regional's application because it considered misleading information, failed to consider all relevant information, and disapproved the sale prior to obtaining a complete financial analysis from Ms. Galvez–Barreiro. As discussed above, it is within BKC's full discretion to determine whether Regional satisfactorily completed the BKC franchise selection process and demonstrated to BKC that it meets all financial criteria. BKC found within its discretion that Regional did not demonstrate it has satisfied all financial requirements. While the Defendants argue that various additional information may have been considered by BKC, the Court finds that it was within BKC's discretion to consider internal standards regarding, for example, appropriate renovation costs to update Burger King restaurants to the standard generally applied by BKC. Prior to disapproving the sale, BKC found, upon an initial review of the Regional application, that Regional proposed a highly leveraged purchase and depended on exaggerated sales projections under BKC's usual standards. Even after the denial letters were sent, BKC's finan-

cial consultant, Ms. Galvez–Barreiro, confirmed BKC's initial conclusions regarding Regional's financial estimates. Regional never resubmitted its application to demonstrate to BKC that it, indeed, could satisfy BKC's standards and criteria. Accordingly, Plaintiff is entitled to summary judgment as Regional also failed to satisfy BKC's financial criteria and ratios for sale approval.

Finally, the Court notes that Defendants' argument that BKC's decision was made with malice or in bad faith is unpersuasive. As discussed above, BKC has various business reasons for rejecting the plan. Moreover, Plaintiff provided Defendants with several extensions of the Franchise Agreement for which the Defendants were already in default, although it was not required to do so. Even more, BKC discussed the denial with the Defendants in order to allow Defendants to obtain approval of the sale with Regional or another prospective purchaser. However, despite allowing additional months to locate proposed purchasers, Defendants failed to produce one that satisfied BKC's selection process. Thus, because the Plaintiff was entitled under Florida law to disapprove the sale to Regional pursuant to terms of the Franchise Agreement, the Court finds it is not in breach of the Franchise Agreements for it decision to reject the Regional proposal.

### B. *Breach of Implied Covenant of Good Faith and Fair Dealing*

▮ In addition to their Breach of Contract claim, Defendants also argue that BKC breached the covenant of good faith and fair dealing when it disapproved of the sale at issue. Under Florida law, every contract includes an implied duty of good faith. *See Burger King Corp. v. Weaver,* 169 F.3d 1310, 1316 (11th Cir.1999) (citing *Hospital Corp. of Am. v. Florida Med. Ctr., Inc.,* 710 So.2d 573, 575 (Fla.App. 4 Dist.1998)). This duty, however, is not an independent one under Florida law. *Id.* at 1316–17. Instead, the plaintiff must allege a separate breach in order to maintain a cause of action. *Id.* Specifically, a cause of action for breach of implied covenant cannot be maintained "(1) in derogation of the express terms of the underlying contract or (b) in the absence of breach of an express term of the underlying contract." *Id.* at 1318. As discussed above, Plaintiff BKC has not breached the Franchise Agreements. Accordingly, since the Plaintiff has not breached an express term of the contracts, no cause of action may stand for breach of the implied covenant of good faith.

▮ Even assuming the Defendants could bring an independent claim for breach of implied covenant of good faith for Plaintiff's abuse of discretion in denying Regional's application, such a claim would fail. In *Ford,* the Eleventh Circuit held that pursuant to the implied covenant of good faith and fair dealing, "one party cannot capriciously exercise discretion accorded it under a contract so as to thwart the contracting parties' reasonable expectations." *Ford,* 260 F.3d at 1291. However, under Florida law, the limit placed on a party's discretion "is not great." *Id.* As a result, a party's decision will not violate the implied covenant of good faith and fair dealing " 'unless no reasonable party … would have made the same discretionary decision.' " *Id.* (quoting *Sepe v. City of Safety Harbor,* 761 So.2d 1182, 1185 (Fla. App. 2 Dist.2000)). The Court in *Ford* held that a manufacturer's decision to disapprove the relocation of a dealership was not capricious or in contravention of the parties' reasonable expectations, where the central purpose of the contract was the sale of cars and not the relocation of the dealership. *Id.* at 1292. Likewise, the Court finds that BKC's decision not to approve the sale to Regional did not

"thwart the reasonable expectations of the parties" in the instant case. The central purpose of the Franchise Agreement was to sell food and/or BKC's various products, not the transfer of the restaurants. *See H & H*, 2001 WL 1850888 at * 7. Moreover, as discussed above, BKC's decision was not capricious as Defendants simply did not locate a prospective purchaser, namely Regional, that demonstrated the managerial and financial requirements set forth in the Franchise Agreement.

## C. *Tortious Interference with Contractual Relations*

█ In its final counterclaim, Defendants assert that BKC tortiously interfered with its contract with Regional for the sale of restaurants where the Plaintiff acted maliciously and egregiously with the intent of sabotaging Regional's interest in its transaction with the Defendants. In particular, Defendants claim that during the May 22, 2000 teleconference, BKC gave false and misleading information to Regional regarding rebuilding and operational requirements in order to harm the sale transaction. Response, p. 15. According to the Defendants, these events, at the very least, create a question of fact regarding their claim for tortious interference that precludes entry of summary judgment.

In response, BKC, relying on the Eleventh Circuit decision in *Ford*, asserts that a franchisor cannot be held liable for tortious interference when the alleged interference is directed at a business relationship to which the franchisor is a party. BKC further argues that the issue of privilege only arises when it is determined that the franchisor is not a party to the business relationship.

In prior orders, this Court has addressed the issue regarding whether the privilege to interfere is limited where a party acts egregiously or with malice against another party. First, in an Order on Plaintiff's Motion to Dismiss Defendants' Counterclaim, this Court noted that a cause of action for tortious interference generally " 'cannot exist against one who is himself a party to the contract.' " *Burger King Corp. v. Ashland Equities, Inc.*, 161 F.Supp.2d 1331, 1336 (S.D.Fla.2001) (quoting *Montgomery & Larmoyeux v. Philip Morris, Inc.*, 992 F.Supp. 1372, 1375 (S.D.Fla.1998)). Accordingly, parties who are in privity of contract are protected from exposure to liability based on claims for tortious interference since such parties have a "privilege to interfere." *Id.* However, this Court further held that, under Florida law, this "privilege is limited and does not afford an absolute bar to liability." *Id.* The privilege to interfere is a valid defense only where "the interference was not done for some improper purpose." *Id.* Because the Court found that the Defendants adequately alleged on the face of the Complaint that BKC denied the proposed sale to Regional for improper purposes, this Court denied Plaintiff's Motion to Dismiss Defendants' counterclaim for tortious interference.

Soon thereafter, however, BKC moved this Court to reconsider its order denying BKC's Motion to Dismiss. The Court once again denied Plaintiff's motion, finding that the Defendants' allegations in the Complaint were sufficient to survive Plaintiff's Motion to Dismiss. *See Burger King Corp. v. Ashland Equities, Inc.*, 181 F.Supp.2d 1366 (S.D.Fla.2002) ("*Ashland II*"). BKC urged the Court to reconsider its decision pursuant to the recent Eleventh Circuit decision in *Ford* arguing, as it does on summary judgment, that the *Ford* Court held that a party to a contract may not be held liable under the theory of tortious interference. However, this Court found in *Ashland II* that the Eleventh Circuit in *Ford* clarified that the "privilege to interfere" was qualified under

Florida law " 'where malice is the *sole* basis for the interference ... In other words, the party must be interfering *solely* out of spite, to do harm, or for some bad motive,' " *Ashland II,* 181 F.Supp.2d at 1373 (S.D.Fla.2002) ("*Ashland II*") (quoting *Ford,* 260 F.3d at 1294 n. 9). Recent decisions in the Southern District of Florida have also interpreted the Eleventh Circuit's decision in *Ford* to limit the "privilege to interfere" where improper means are employed by a party to the contract at issue. *See H & H,* 2001 WL 1850888, at * 8 (holding that franchisor, Burger King, entitled to summary judgment on Defendant's tortious interference claim where Defendant did not show Burger King's sole basis for disapproving the sale to prospective purchaser was malicious).

The Defendants have not made a showing on this record that BKC's sole reason for disapproving the sale at issue was malicious. Indeed, as stated above, the Plaintiff went beyond the Franchise Agreements to aid the Defendant to pay their outstanding royalties by extending some contracts and allowing time to obtain a proposed purchaser. The allowance of additional time, despite Defendants' default, negates, at least in part, any inference that the disapproval of the proposed purchaser was solely motivated by some bad motive. In addition, Plaintiff BKC has provided various business reasons for its decision not to approve the sale to Regional. BKC concluded within its discretion that Regional's projections were unrealistic, that Regional's principals lacked fast food franchise operational experience, and that Regional failed to incorporate remodeling and other costs into its proposals. Based on this record, the Court finds that the Defendants have failed to show that BKC's sole basis for rejecting Regional's proposal was based on bad motive or malice. Hence, Plaintiff's Motion for Summary Judgment should be granted as to this claim.

### D. *Motion to Strike Declarations of Michael Alonso, Craig Prusher, and Frank Taylor*

In Defendants' Motion to Strike the Declarations of Michael Alonso, Craig Prusher, and Frank Taylor [D.E. 143], Defendants argue that the aforementioned declarations include entirely new facts and support entirely new arguments forwarded for the first time in Plaintiff's Reply brief. Specifically, Defendants assert that (1) Michael Alonso's Declaration raises for the first time that he performed a review of Regional's plan prior to May 3, 2002; (2) Craig Prusher's declaration supports BKC's new argument that Defendants anticipatorily repudiated the Franchise Agreements; and (3) Frank Taylor's second declaration states for the first time that 9% is the standard discount rate in the franchise industry. In response, Plaintiff argues that the declarations do not raise or support new arguments or facts. Upon review of the Motion, the record, and relevant law, the Court finds that Defendants' Motion to Strike should be denied.

First, Michael Alonso's declaration is not the first time the Defendants were made aware that Alonso performed a review of the Regional plan prior to the full financial review by Ms. Galvez–Barreiro. Indeed, Ms. Galvez–Barreiro attests in her deposition that Alonso reviewed Regional's application before she received relevant documents. *See* Galvez–Barreiro Depo., p. 49. Moreover, other deposition testimony clearly references a review of Regional's application by Michael Alonso. *See* Hicks Depo., p 36; Prusher Depo., pp. 19–20. As a result, Defendants clearly had notice that Alonso reviewed Regional's application. Finally, the Court finds that Plaintiff appropriately utilized Alonso's declaration to rebut Defendants' argument that Plaintiff did not conduct any type of initial

financial analysis prior to May 17, 2000.[10] Accordingly, Alonso's declaration should not be stricken.

Likewise, the Declaration of Craig Prusher should also remain as part of the record since it supports Plaintiff's rebuttal to Defendants' assertion regarding lost profits under *Postal Instant Press,* 51 Cal. App.2d 365 (Cal.Ct.App.1996) in their Response. Moreover, Defendants' Motion to Strike the Prusher's Declaration, appears moot as Plaintiff BKC has withdrawn its claim for lost profits.

Finally, in regard to Frank Taylor's declaration, this submission simply constitutes a supplement to Taylor's first declaration which clearly asserts that a nine (9%) percent net rate applies to the computation of lost profits. Again, the motion to strike this declaration appears moot as Plaintiff has withdrawn its claim to lost profits in this matter. However, even if addressed on the merits, the additional statement that a 9% rate applies in the industry is not a new argument and should not be stricken.

Accordingly, it is

**ORDERED AND ADJUDGED** that Plaintiff's Motion for Summary Judgment on Plaintiff's Complaint and Defendants' Counterclaim [D.E. 76] is GRANTED. Plaintiff is entitled to the amount of $329,440.30. It is further

**ORDERED AND ADJUDGED** that Defendants' Motion to Strike [D.E. 143] is DENIED, as discussed herein. It is finally

**ORDERED AND ADJUDGED** that all other pending motions not otherwise ruled

10. The Court notes that the Defendants did not file a Reply in response to Plaintiff's argu-

upon are DENIED as MOOT and that this case is CLOSED.

ments in opposition to their Motion to Strike.